# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs December 14, 2004

## STATE OF TENNESSEE v. WESLEY EARL BROWN

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2002-A-328     Cheryl Blackburn, Judge**

---

### No. M2003-02804-CCA-R3-CD - Filed June 16, 2005

---

The defendant, Wesley Earl Brown, was convicted of two counts of rape of a child, a Class A felony, and three counts of aggravated sexual battery, a Class B felony, and was sentenced to twenty-five years for each rape conviction, to be served consecutively, and ten years for each sexual battery conviction, to be served concurrently but consecutively to the rape convictions, for a total effective sentence of sixty years. On appeal, he argues: (1) the evidence was insufficient to support his convictions; (2) the trial court erred in admitting evidence of prior bad acts; and (3) the trial court erred in sentencing. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and JAMES CURWOOD WITT, JR., J., joined.

Jodie A. Bell (on appeal) and Matthew Mayo (at trial), Nashville, Tennessee, for the appellant, Wesley Earl Brown.

Paul G. Summers, Attorney General and Reporter; Preston Shipp, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Brian Holmgren, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

Following the State's election, the five counts which the jury considered and convicted the defendant were for the rape of a child occurring between October 14, 1998, and March 31, 2001; (Counts 1 and 2), and aggravated sexual battery occurring between October 14, 1998, and March 31, 2001 (Counts 3, 4, and 5). We will set out the trial testimony.

## FACTS

The defendant's stepdaughter, D.M.,[1] who was twelve years old at the time of the trial, testified that she had lived with her grandmother for the last eight years except for a period of about a year when she lived with her mother, Tracey Davidson Brown, and the defendant at their trailer. She stated that her mother and the defendant had a son who was four years old at the time of the trial. Additionally, the victim's grandfather, Jerry Davidson, lived with the defendant and the victim's mother at the trailer.

The victim testified to at least five distinct instances of sexual contact between herself and the defendant, which had occurred when she was in the fourth and fifth grades. The incident she remembered best occurred in the living room of the defendant's trailer. After Jerry Davidson left the living room, the defendant began touching her on the "inside" of her "front place" with his finger. His finger was "going around" her skin, which made her feel uncomfortable in her stomach. The incident lasted for a "few minutes." She illustrated the touching on an anatomically correct female doll, and for the record, the assistant district attorney stated, "[T]he witness has demonstrated a finger inserted between the labial lips" of the doll.

A second incident occurred in the living room at her grandmother's house when the defendant touched her on her "front private part and he was putting his finger in there and moving it around." The defendant put his hand inside her clothes. At the time, the victim was living with her mother and the defendant at their trailer, and they were visiting at her grandmother's house. She did not call out for others to come into the room because she was "scared."

The victim also recalled that the defendant touched her on the "front part of [her] privates" without putting his finger inside her. This occurred in the living room and the bedroom at the defendant's trailer. Asked what the defendant did with his hand on those occasions, the victim responded that he "move[d] it around."

On a separate occasion, the defendant had the victim touch his penis while they were in the bathroom. She demonstrated on an anatomically correct male doll, and with an ink pen, how the defendant had her touch him on his "front part . . . [o]n his skin" when his pants were "[o]pen and down." On the doll, the victim placed the palm of her hand on the penis, and on the ink pen, she encircled the pen with her finger and thumb. Touching the defendant felt "[y]ucky" on her hand; however, she did not do anything with her hand while touching him. She stated that this happened "towards the end" of the sequence of events involving sexual contact between her and the defendant.

---

[1]It is the policy of this court to refer to juvenile victims of sexual offenses by their initials.

The victim testified that the defendant showed her television programs showing "girls with their clothes off . . . having sex."[2]  "Probably about ten" times as they were watching the programs, the defendant touched her.  "A couple" of times as they watched the programs, he did not touch her.  Occasionally, the defendant's male friends would also be at the house watching these programs.

The victim stated she did not tell anyone about these incidents because she was "nervous and scared."  When she was eleven years old, she told her grandmother about the defendant's activities because she was "feeling bad one night" and could not go to sleep.  The victim did not tell her mother what was happening because she was "embarrassed."  She said the defendant began touching her when she was five and six years old and that the incidents began after her brother was born.

On cross-examination, the victim testified she could not remember what year she lived with her mother and the defendant, only that it was "a couple of years ago."  She said that the incidents with the defendant happened within the last three years and that she had not seen him in a year.  She did not believe that she ever told the defendant "no," and he never told her why he was doing it nor asked her if he could.  On redirect, the victim stated that some of the touching happened before her brother was born, but the incidents she remembered best occurred after he was born.

Phyllis Thompson, a licensed clinical social worker with Our Kids Center in Nashville, testified she interviewed the victim on May 15, 2001, in order to obtain her history for purposes of medical diagnosis and treatment.  She said that the victim, who was ten years old at the time, "went straight in and talked about concerns related to different kinds of touching."  The victim did not demonstrate any difficulty in understanding the questions being asked, and she appeared to have "adequate cognitive and developmental abilities" for a ten-year-old.  Utilizing anatomically correct drawings of unclothed children, the victim told Thompson that she was "concerned about her bottom," which she indicated on the drawings meant her genital area.  The victim said the defendant had "touched that area with his hand on the skin and that it hurt."  She said that the defendant "touched her butt one time, both inside and outside," and once had her touch his penis.

Sue Ross, a pediatric nurse practitioner at Our Kids Center, testified she examined the victim on May 15, 2001.  While obtaining the victim's medical history from her grandmother, Ross discovered that the victim had been diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD").  Ross conducted a genital examination, during which the victim was cooperative but "very, very anxious."  Ross did not observe any abnormal or unusual findings during the examination.  On cross-examination, she stated that rarely would physical evidence of digital penetration be visible.  Her examination revealed that the victim's anal and vaginal areas were "totally normal."  On redirect, she stated that there could be digital penetration of the labia, moving "[b]ackwards, forwards, up, down," and still not be any sign of injury.

---

[2]Although these movies were variously described as "pornographic" or "sexually explicit," we note that they were broadcast commercially on the "Playboy Channel."  The record does not reveal whether the movies allegedly were obscene, as defined by Tennessee Code Annotated sections 39-17-901 to -920, or simply were unrated "adult" films.

Tracey Dawn Davidson Brown, the victim's mother and the defendant's wife, testified she and the defendant had been married for almost five years but were separated at the time of trial. She and the defendant had a four-year-old son. The victim had lived with the victim's grandmother since she was four years old because Mrs. Brown had some "health issues." The victim stayed with the Browns "occasionally on weekends" and lived with them for about four months during the summer of 2000. Mrs. Brown never observed any inappropriate sexual behavior between the defendant and the victim and was never made aware of any such contact. She said that as they "would be flipping through [satellite television] channels . . . the [defendant] would stop at [an adult] channel and thought it was funny and would try and get [the victim's] attention long enough for her to glance at it." Mrs. Brown would "yell, tell [the defendant] to change the channel [and] tell [the victim] not to look at it." To try and get the victim to watch the program, the defendant "would say: 'Hey, [D.M.], look, look at the TV, look.'" She agreed that the incidents involving the defendant and the victim probably occurred between October 1999 and January 2001. There were times when the victim seemed afraid of the defendant.

Robert Samuel Barnes, an inmate at the Davidson County Jail, testified that the defendant, while in custody, admitted to Barnes that he had sexual relations with his stepdaughter, saying that she was ten years old at the time. Barnes said he volunteered this information to the police. He also admitted to having been convicted of burglary, criminal simulation, theft, and a bomb threat.

April Lynette Carson testified that she had been a friend of the victim's mother for about three years and had lived in the same neighborhood. She said she was present at the defendant's home when he exposed the victim to pornographic television programs several times. The defendant told the victim to look at what was on the television, and she and Mrs. Brown told him to turn it off, which he did. She stated that the defendant "talked mean" to the victim, and they "did not get along at all."

Laura Davidson, the victim's grandmother, testified that the victim had been living with her for nine years. In the summer of 2000, she let the victim move in with her mother to see if it would work out; however, it did not. The victim was diagnosed with ADHD when she was five and had received medication and treatment for it. In April 2001, Mrs. Davidson contacted the Department of Social Services after the victim told her that the defendant had been touching her "inappropriately," which the victim later described as the defendant "putting his fingers in her vagina and her rectum." About a week before this disclosure, the victim was taken to the hospital, while spending the night with her mother and the defendant, because she was having an anxiety attack. Subsequently, the victim began getting "real anxious" at bedtime, and she finally disclosed the sexual abuse to her grandmother. The victim asked her grandmother to promise not to tell anyone because she thought that her mother would not love her if she found out.

Detective David Zoccola of the Metropolitan Nashville Police Department testified regarding his investigation of the victim's case. He had worked in the youth services division for about five years, and the victim's case was assigned to him after the initial report was made to the Department of Children's Services.

The defendant elected not to testify or present any proof.

## ANALYSIS

### I.  Sufficiency of the Evidence

The defendant contends that there was insufficient evidence to support his convictions, arguing that the testimony of the victim was not believable because she was "confused" and "unclear" about what happened.  He further asserts that there was insufficient physical evidence of penetration to support the rape convictions and that the State failed to prove that his sexual contact with the victim was for "sexual arousal or gratification," and therefore, the aggravated sexual battery convictions should be reversed.

In considering this issue, we apply the familiar rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).  All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact.  See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987).  "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State."  State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973).  Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation.  The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand.  Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses.  In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)).  A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient.  See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).  We will apply these considerations to the evidence presented in this matter.

"Rape of a child is the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if such victim is less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-522(a) (2003). "Sexual penetration" is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body." Tenn. Code Ann. § 39-13-501(7) (2003). The emission of semen is not required. Id.

The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the evidence are matters entrusted exclusively to the jury as the triers of fact. State v. Cribbs, 967 S.W.2d 773, 793 (Tenn. 1998). It is not the prerogative of this court to revisit questions of witness credibility on appeal, that function being within the province of the trier of fact. See generally State v. Carey, 914 S.W.2d 93, 95 (Tenn. Crim. App. 1995); State v. Boling, 840 S.W.2d 944, 947 (Tenn. Crim. App. 1992).

As to proof of sexual penetration, D.M. recounted at least two separate occasions when the defendant put his finger or fingers "in her," once in the living room of the defendant's residence and once in the living room of the victim's grandmother's residence. Using anatomically correct dolls, she demonstrated in court where the defendant put his fingers. She distinguished between those times when the defendant put his fingers inside her and when he simply touched her on the outside. By its verdict, the jury determined that the defendant had at least twice sexually penetrated the victim, and the record supports this determination.

To prove aggravated sexual battery, the State was required to show "unlawful sexual contact" with the victim by the defendant accompanied by any of the following circumstances:

> (1) Force or coercion is used to accomplish the act and the defendant is armed with a weapon or any article used or fashioned in a manner to lead the victim reasonably to believe it to be a weapon;
> (2) The defendant causes bodily injury to the victim;
> (3) The defendant is aided or abetted by one (1) or more other persons; and
>     (A) Force or coercion is used to accomplish the act; or
>     (B) The defendant knows or has reason to know that the victim is mentally defective, mentally incapacitated or physically helpless; or
> (4) The victim is less than thirteen (13) years of age.

Tenn. Code Ann. § 39-13-504(a) (2003). "Sexual contact" is defined as "the intentional touching of the victim's, the defendant's, or any other person's intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's, the defendant's, or any other person's intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." Id. § 39-13-501(6). A person "acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." Id. § 39-11-302(a).

The defendant asserts that any contact between him and the victim was not for "sexual arousal or gratification," but instead was a way for him to dominate and humiliate the victim because he "did not like" her, and he harbored no "sexual desire for her." Taken in the light most favorable to the State, a reasonable jury could conclude that the defendant touched the victim's genitals on at least two separate occasions and had her touch his penis at least once in the bathroom. Some of the sexual contact was contemporaneous with the showing of "sexually explicit" programming to the victim, and the defendant asked the victim not to tell anyone. The touching took place usually when other family members were in other parts of the house or away from the house on errands. Thus, the jury could reasonably conclude that the defendant intentionally touched the victim's vagina, and had her touch his penis, for the purpose of sexual arousal or gratification. See State v. Hayes, 899 S.W.2d 175, 180 (Tenn. Crim. App. 1995) (noting that intent in sexual battery cases is often proved by circumstantial evidence, including conditions under which the touching occurred); see also State v. Meeks, 876 S.W.2d 121, 131 (Tenn. Crim. App. 1993) ("We recognize that jurors may use their common knowledge and experience in making reasonable inferences from evidence."). Finally, we note that the statute only requires an intentional touching that can be "*reasonably construed* as being for the purpose of sexual arousal or gratification." Tenn. Code Ann. § 39-13-501(6) (emphasis added); see also State v. Roy Chisenhall, No. M2003-00956-CCA-R3-CD, 2004 WL 1217118, at *3 (Tenn. Crim. App. June 3, 2004). Thus, we conclude that the evidence was sufficient for a rational trier of fact to find the defendant guilty beyond a reasonable doubt of aggravated sexual battery.

## II. Testimony as to Prior Bad Acts

The defendant argues the trial court erred in allowing testimony that he exposed the victim to "sexually explicit" television programming, asserting that the trial court was required under Rule 404(b) of the Tennessee Rules of Evidence to conduct a hearing outside the presence of the jury before ruling on the admissibility of this evidence as a prior bad act committed by him.

Before considering this issue, we first will trace how it developed in the trial court.

The defendant filed a motion asking that the State provide notice of Rule 404(b) material prior to trial, and the State responded, contemporaneously with the pretrial motion hearing, by notifying the defendant that it intended to present, *inter alia*, evidence that he showed the victim "sexually explicit" programs. According to the State's response, this evidence was "relevant to establish the specific mens rea" and was "part of the modus operandi of the defendant in engaging in sexual contact with the alleged victim." At a pretrial hearing, the State argued that the showing of these programs was "within the context of these other acts" as a "part of the defendant's attempt to indoctrinate the victim sexually into behaviors and/or lower her inhibitions about engaging in that behavior with him." Defense counsel first acknowledged that the victim could "testify" to the showing of the programs but asserted that any testimony from a third party would be "unfairly prejudicial." The court questioned why it would not be relevant for a third party to testify to seeing the defendant show these programs and stated that "[o]bviously, a victim can testify to it," especially

if the programs were shown "during the course" of the sexual abuse. The court stated that before any other witnesses testified, a "jury-out hearing" would be conducted.

Subsequently, the defendant filed a motion to exclude any testimony concerning the "sexually explicit" programs, relying on Rule 403 of the Tennessee Rules of Evidence, asserting that the probative value of the evidence would be "substantially outweighed by the danger of unfair prejudice."

At the start of trial, and with the venire outside the courtroom, the trial court again addressed the motion and explained the need to find out more about the testimony as to "sexually explicit" movies to determine whether the prejudicial effect was outweighed by its probative value:

> THE COURT: Now, [defense counsel], you filed a motion in limine about the sexually explicit movies?
>
> [DEFENSE COUNSEL]: I did, Your Honor. The State has given me some information about a witness, who I'm assuming would be called by the State, and would testify as to the child watching a sexually explicit movie. And I'm assuming that the State would also ask the child about watching the movie. And my point, Your Honor, is: Although it's relevant, it's more prejudicial than it is probative. It just does not go to the issue of whether my client committed these crimes at all and -- it's just grossly unfair to have that type of –
>
> THE COURT: Well, now, let's -- we went over this to some extent on Friday, and I think my ruling was before anyone other than the victim mentioned that, we would have a jury-out hearing on it. So we've discussed that.
>
> [DEFENSE COUNSEL]: Is the victim –
>
> THE COURT: I said other than the victim. Now, the victim, as I understood, the purpose of that was it is things that occurred as part and partial [sic] of this whole episode. It's not some separate offense, but that the State was intending to introduce that to show the intent, lack of mistake or accident.
>
> . . . .
>
> [DEFENSE COUNSEL]: Well, if this was part of -- if part of her testimony would be he showed me a sexually explicit movie, then he made an inappropriate, you know, physical assault on me, I could understand that. But if this is totally separate, totally unrelated in date and time and place, then I believe that's unfair and prejudicial to my client. You know, to bring it in –
>
> THE COURT: Well, now, you're asking 403 as to 404B. Which are you asking?

[DEFENSE COUNSEL]:  Well, to be honest, Your Honor, I think it applies to all of them.

THE COURT:  Well, there's a different standard.

[DEFENSE COUNSEL]:  I agree, I agree.

THE COURT:  For example, if I use the 403 grounds, the prejudice would have to substantially outweigh the probative value.  Whereas if it's the 404B, it['s] just that it has to outweigh it.  So there's a big difference.

[DEFENSE COUNSEL]:  My purpose is to not have it come in.

THE COURT:  At all.  I get that impression.

. . . .

THE COURT:  . . . What we're going to do is we're going to start this trial, and then we're going to have at some point before the victim testifies thoroughly, I'm going to hear from the victim about how it occurred in the context.  And that way I can determine.  Clearly the State is indicating there's a material issue, and that is what his intent was, that this would be probative of that.  I'm just going to have to determine whether or not the prejudice outweighs the probative value, so that's it.  So don't mention it other than until we get down to that.

Okay.  Now, are we ready for the jury?

Thus, as we view this matter, as the trial was set to begin, defense counsel conceded that testimony would be admissible if the victim testified that the defendant's showing of a "sexually explicit" movie was followed by his sexually assaulting the victim.  The trial court said that, as to the showings, a determination would have to be made as to how they occurred in context and that the victim would not be allowed to testify as to the movies until the court determined whether the probative value of the testimony outweighed its prejudicial effect.

Later, the trial began with the victim as the first witness.  The State did not advise the court before the victim was questioned as to the movies, and the defendant did not object, either at trial or in the motion for new trial, that the State had presented her testimony without following the trial court's instructions as to a jury-out hearing to weigh the probative/prejudicial effect of the testimony.  In her direct examination, she described the movies as being "on the television channel" number "[s]ixty-six," rather than a videotape.  As for their content, she said that they showed "those girls with their clothes off and they're having sex."  She said she and the defendant watched a movie as he touched her, and "[p]robably about ten" times they watched a movie as he had her touch him.  On "[a] couple" of occasions, when they watched one of the movies, the defendant did not touch her.

-9-

The victim's testimony as to watching movies with the defendant was only a small part of her lengthy direct and cross-examination and came after she had testified extensively as to the sexual acts by the defendant.

At the conclusion of the victim's testimony, the trial court instructed the jury as to the purposes for which it could consider whether the defendant had shown "sexually explicit" movies to her:

> If from the proof you find that the defendant has committed crimes other than that for which he's on trial, you may not consider such evidence to prove his disposition to commit a crime. You may only consider it for the following purpose, and that is a complete story of the crime. That is such evidence may be considered by you where the crimes are logically related or are a part of the same transaction so that the proof of one is necessary to prove the other. The other is to his motive. That is such evidence may be considered by you if it tends to show a motive of the defendant for the commission of the charge or for the defendant's intent. That is such evidence may be considered by you if it tends to establish that the defendant actually intended to commit the crime for which he is currently charged. For that I'm referring to the comments about the showing of the movies to [the victim].

Before the testimony of Tracey Brown and her friend, April Carson, the State argued that the defense had "attacked" the victim's credibility, and, therefore, Brown and Carson should be allowed to testify as to the defendant's showing movies to the victim, this testimony being "probative and relevant with regard to [the victim's] credibility and the defendant's motives and intent as well."

Mrs. Brown testified that the defendant would stop at such programs, as they were "flipping" through channels, and "thought it was funny and would try and get [the victim's] attention long enough for her to glance at [the movie]."

In his motion for new trial, the defendant argued that the trial court erred in "allow[ing] any testimony by any witness concerning the defendant watching any movies of a sexual nature or the defendant forcing the victim to watch any movies of a sexual nature in his presence." At the hearing on this motion, defense counsel explained the legal basis for his objection, saying, "[W]e . . . renew our objection based on the fact that 403 should exclude . . . that testimony due to the fact it's highly prejudicial, and it doesn't have any relevance or give any evidence toward the fact that [the defendant] may or may not have committed the alleged crimes." Thus, at the trial court, both in his pretrial motion to exclude the testimony and at the hearing on his motion for new trial, the defendant relied solely upon Tennessee Rule of Evidence 403 in claiming that testimony as to the movies should not be allowed. However, on appeal, it is presented as a Rule 404(b) violation, that the court did not conduct a hearing, before the victim's testimony, and did not make the required findings. Thus, at trial, the defendant relied upon one evidentiary basis for this claim but has relied upon a different basis on appeal, presenting this court with an argument as to which the trial court did not have the opportunity to consider and rule.

As this court said in State v. Alder, 71 S.W.3d 299 (Tenn. Crim. App. 2001), "[i]t is well settled that an appellant is bound by the evidentiary theory set forth at trial, and may not change theories on appeal." Id. at 303 (citing State v. Banes, 874 S.W.2d 73, 82 (Tenn. Crim. App. 1993)). Thus, we conclude that, because of the changing theories of inadmissibility at trial and on appeal, this claim is waived.

If this issue had not been waived, we would conclude that the defendant's arguments were without merit. The situation presented by this appeal is very similar to that of State v. McCary, 119 S.W.3d 226 (Tenn. Crim. App.), perm. to appeal denied (Tenn. 2003), wherein the defendant had been convicted in two trials of a number of sexual acts against two minor victims. At the first trial, the victim testified that "the defendant allowed him to look through a pornographic magazine . . . [and] had a briefcase that contained several pornographic videos and a number of pornographic magazines." Id. at 237. On several subsequent occasions, the defendant played a pornographic videotape as he and the victim masturbated, the defendant once touching the first victim's penis as they were watching. In the trial as to the second victim, he testified that the defendant had shown him a pornographic magazine and another time had "helped" him to masturbate as a pornographic video was being shown. Id. at 239-40. On appeal of the two convictions, the defendant argued that pornographic videotapes and magazines found in his briefcase, "but not specifically identified by either victim, should have been excluded under Rule 404(b)." Id. at 245. This court explained that the pornographic material identified by the victims was admissible to corroborate their testimony as to the seduction method used by the defendant:

> In our view, the fact that the police discovered various pornographic media in the defendant's possession was probative as it tended to corroborate the account provided by each victim that the defendant used pornography as a means of seduction. Magazines and videotapes that each victim could identify as that the defendant kept in his briefcase would be relevant and not so prejudicial as to preclude admission into evidence.

Id. at 246.

Thus, while McCary was correct in arguing that it was error to admit such pornographic videotapes and magazines which the victims could not identify, proof as to those they could identify was admissible to show his "means of seduction." Additionally, this court explained that "[g]iven the defendant's admissions and overwhelming proof of his guilt," any error in admitting the pornographic videotapes and magazines was harmless. Id. We conclude likewise in the present appeal. Even if this were not the case, however, and the trial court had erred, as the defendant argues on appeal, the error would have been harmless.

We note that other courts, often to show a defendant's "grooming" of a victim, have concluded that evidence of bad acts committed during or in preparation for the charged offense was admissible. See Frazier v. State, 557 S.E.2d 12, 18 (Ga. Ct. App. 2001) ("[Y]oung victim's testimony that [the defendant] forced her to watch a pornographic video with him at the same time

that he sexually molested her was [admissible as] part of circumstances surrounding the independent act of child molestation."); State v. Blackstead, 878 P.2d 188, 192 (Idaho Ct. App. 1994) (probative value outweighed prejudicial effect of testimony as to use of marijuana by the defendant and victim "shortly before the sexual molestation," as was his gift of marijuana "immediately thereafter," to give a "full explanation of how the sexual contact came about" and how the defendant "lower[ed] [the victim's] resistance to his sexual advances"). Likewise, in State v. Anderson, 657 N.W.2d 245, 247-49 (N.D. 2003), the court concluded that since Rule 404 is directed only to prior acts which are independent of the charged crime, a defendant's letter and card to his daughter recounting the acts for which he was charged are relevant and "do not constitute inadmissible character evidence."

This assignment is without merit.

### III. Sentencing

The defendant contends the trial court imposed excessive sentences in that it improperly applied certain statutory enhancement factors and erred in imposing consecutive sentencing. Additionally, he asserts in his reply brief that his sentences are violative of the recent United States Supreme Court decision in Blakely v. Washington, 524 U.S. __, 124 S. Ct. 2531 (2004). However, our supreme court has determined that Blakely does not affect Tennessee's sentencing procedures. See State v. Gomez, __ S.W.3d __, 2005 WL 856848 (Tenn. 2005). Accordingly, Blakely is inapplicable.

When an accused challenges the length and manner of service of a sentence, it is the duty of this court to conduct a *de novo* review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d) (2003). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). "If the trial court applies inappropriate factors or otherwise fails to follow the 1989 Sentencing Act, the presumption of correctness falls." State v. Shelton, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992).

In conducting a *de novo* review of a sentence, this court must consider: (a) any evidence received at the trial and/or sentencing hearing, (b) the presentence report, (c) the principles of sentencing, (d) the arguments of counsel relative to sentencing alternatives, (e) the nature and characteristics of the offense, (f) any mitigating or enhancing factors, (g) any statements made by the accused in his own behalf, and (h) the accused's potential or lack of potential for rehabilitation or treatment. See Tenn. Code Ann. § 40-35-210; see also State v. Scott, 735 S.W.2d 825, 829 (Tenn. Crim. App. 1987).

The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. See Tenn. Code Ann. § 40-35-401, Sentencing Commission Cmts.; see also Ashby, 823 S.W.2d at 169.

-12-

There is no mathematical formula for evaluating the enhancement factors to calculate the appropriate sentence. See generally State v. Boggs, 932 S.W.2d 467, 475 (Tenn. Crim. App. 1996). "Rather, the weight to be afforded an existing factor is left to the trial court's discretion so long as the court complies with the purposes and principles of the 1989 Sentencing Act and its findings are adequately supported by the record." Id. at 475-76 (citations omitted).

At the sentencing hearing, Tracey Brown testified that her daughter, D.M., was diagnosed with ADHD, which required medication, at the age of four, as well as a "questionable diagnosis of bipolar" around "maybe six months, a year ago." She said she had witnessed the defendant showing the victim sexually explicit programs "[a] couple of times," and the victim had received mental health treatment at "Centerstone or Dede Wallace."

Laura Davidson testified that the victim "has received treatment and is still receiving treatment" for the sexual abuse. Additionally, the victim has become "very aggressive" and has "soiled her pants several times" since the abuse. Testifying at the trial caused the victim to be "very anxious" because "[s]he didn't want to have to see [the defendant] and she hated the idea of having to get in front of people and talk about such private embarrassing things." After visiting with her mother and the defendant on one occasion, the victim returned home and for "about a six-month period," she "was actually having bowel movements in her pants," which Mrs. Davidson stated she was sure was "one of the symptoms of the sexual abuse." Since the abuse, the victim has had "anxiety attacks," for which she takes Paxil, and she will no longer sleep in her own bedroom.

The defendant did not testify or present any proof at the sentencing hearing.

The defendant was convicted of two counts of rape of a child, a Class A felony, and three counts of aggravated sexual battery, a Class B felony. He was sentenced to the maximum in the range, twenty-five years, for each of the rape convictions, to be served consecutively, and the midpoint in the range, ten years, for each of the aggravated sexual battery convictions, to be served concurrently to each other but consecutively to the rape convictions, for a total effective sentence of sixty years. The trial court applied three enhancement factors to all the sentences, applying great weight to factors (5) and (16): (2), the defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the range; (5), the victim of the offense was particularly vulnerable because of age or physical or mental disability; and (16), the defendant abused a position of public or private trust. In addition, the court applied enhancement factor (8), the offense involved a victim and was committed to gratify the defendant's desire for pleasure or excitement, to the two counts of rape of a child. See Tenn. Code Ann. § 40-35-114(2), (5), (8), (16) (2003). The court found no mitigating factors were applicable. See Tenn. Code Ann. § 40-35-113 (2003).

On appeal, the defendant questions only the imposition of factor (8) as applied to the convictions for rape of a child, asserting that the court "specifically found this factor based upon allegations that [the victim] was exposed to sexually explicit movies." According to the defendant, his exposing the victim to the movies occurred when he "would essentially be channel surfing and

-13-

he would call her attention to the Playboy Channel" and did so "to belittle, embarrass and humiliate her." The State responds that the defendant's desire for pleasure or excitement in viewing the Playboy channel with the victim was proven by the fact that he "would 'touch' her while he made her watch the pornography, and vice versa."

Although affording little weight to the factor, the trial court concluded that factor (8) was applicable because of the defendant's showing "these sexually explicit movies, which would allow [the court] to determine why on earth all these events occurred."

In State v. Arnett, 49 S.W.3d 250 (Tenn. 2001), our supreme court explained the circumstances in which factor (8) was applicable:

> [F]actor [(8)] may be applied with evidence including, but not limited to, sexually explicit remarks and overt sexual displays made by the defendant, such as fondling or kissing a victim or otherwise behaving in a sexual manner, or remarks or behavior demonstrating the defendant's enjoyment of the sheer violence of the rape.

Id. at 262 (citations omitted).

In the present appeal, the victim testified that "touching" would occur when she and the defendant were watching the sexually explicit movies. From this, we conclude that the record supports the trial court's determination that factor (8) was applicable to the convictions for rape of a child. Even if the trial court had erred in applying this factor, as the defendant argues, we note that the defendant has not contested the application of factors (2), (5), and (16), the latter two of which were assigned great weight. Accordingly, the record supports the sentences imposed for rape of a child.

The trial court imposed consecutive sentences based on Tennessee Code Annotated section 40-35-115(b)(5), which sets out the situations in which such sentencing may be ordered:

> (b) The court may order sentences to run consecutively if the court finds by a preponderance of the evidence that:
>
> . . . .
>
> (5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims[.]

In sentencing the defendant, the court explained that this statutory factor applied to him:

-14-

Clearly, factor number five under 40-35-115 applies, and that is he is convicted to two or more statutory offenses involving sexual abuse of a minor which factors arose out of the relationship between the defendant and the victim, the time span that it went undetected was, you know, I've heard of longer and I've heard of shorter. I think it was a period of time.

The nature and the scope of the acts and the extent of the residual physical and mental damage to the victim. She is still in treatment. She has become aggressive. She can't sleep in her room.

I think clearly that this factor justifies consecutive sentences.

. . . .

Well, the fact of the matter is the Wilkerson factors do not apply to factor number five, and that is when considering multiple sentences where the basis is factor number five, the Supreme Court has said you don't have to consider Wilkerson. I mean, that is just clear. Wilkerson only applies to dangerous offenders, but I'm going to apply it anyway, and that is I think in this particular case, Count 1 and 2 are going to run consecutive. Counts 3, 4 and 5 are going to run concurrent with each other, but consecutive to Counts 1 and 2, for a total effective sentence of 60 years, and I'm going to find that this aggregate term reasonably relates to the severity of the offenses based on the facts I've heard, the observations of [the victim], and it is also necessary to protect the public from further serious conduct by the defendant, so even though the law doesn't require me to, I'm going to apply the Wilkerson factors in this particular case.

As to the defendant's argument that State v. James M. Powers, No. E2001-02363-CCA-R3-CD, 2002 WL 31387308 (Tenn. Crim. App. Oct. 23, 2002), perm. to appeal denied (Tenn. Mar. 10, 2003), requires modification of consecutive sentencing in the present case, we disagree. In Powers, this court determined that the facts did not justify the application of Tennessee Code Annotated section 40-35-115(b)(5) because there was "no significant time span of undetected sexual activity and the nature of the criminal conduct was not aggravated beyond what is inherent in sex crimes committed against children." Id. at *5. In the present case, the offenses occurred within the time frame of about fifteen months. The defendant is the victim's stepfather and, as such, took advantage of and abused this "close relationship." The victim impact statement submitted by the victim's grandmother and testimony at the sentencing hearing established that since the disclosure of the sexual abuse, the victim has been diagnosed as bipolar, suffers from anxiety, has become aggressive, and has had to have her medication increased. Accordingly, we conclude that the trial court was justified in imposing consecutive sentences pursuant to Tennessee Code Annotated section 40-35-115(b)(5).

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the convictions and the imposition of consecutive sentencing.

_____
ALAN E. GLENN, JUDGE